**In re Kimberly L. WITTMEYER, Debtor.**

**John H. Ring III, as Chapter 7 Trustee of the Estate of Kimberly L. Wittmeyer, Plaintiff,**

**v.**

**Michael Wittmeyer, Defendant.**

**Bankruptcy No. 02–17198 K.**
**Adversary No. 03–1067 K.**

United States Bankruptcy Court, W.D. New York.

Jan. 30, 2004.

John H. Ring III, Buffalo, NY, for Trustee.

Daniel E. Wisniewski, Buffalo, NY, for Defendant.

MICHAEL J. KAPLAN, Bankruptcy Judge.

The Court writes today because the simple facts presented by stipulation in this Adversary Proceeding offer a vehicle upon which to memorialize and reinforce two parallel lines of reasoning that have guided this writer's decisions in all of the many, many times that this or a similar issue has been presented to this writer. Title to an asset is in the Debtor, but someone else who is not a debtor in a bankruptcy case claims that all equitable and beneficial interest in the asset belongs to him. The line of reasoning that has invariably guided this writer's rulings in similar instances in the past, and in this case, is that where there is a recording statute, and a claimant seeks to prove ownership adverse to the public record, and he or she was a party to the decision to establish that public record, that claimant will not be heard to claim that public record is wrong.

The parallel line of reasoning is that when there exists a way that a claimant could have used a statute or public record to document the property claim that he is now asserting, but he chose not to ascertain its existence or to avail himself of it, he may not be heard to now claim that he should be treated here as if he had availed himself of the statute and had done

so with flawless documents. (We know that even car dealers, construction companies, and banks sometimes make a mistake that is fatal to *their* claim of a perfected lien). One may not be heard here to claim that he should be treated as if he were a perfected secured lienholder on a motor vehicle, or inventory, or land, when in fact he chose not to utilize the sometimes-treacherous statutory method to obtain a perfected lien on the asset (or land, or inventory, etc.).

█ The simple stipulated facts here are that the Debtor and her ex-husband were divorced sometime prior to her Chapter 7 filing. At the time of the divorce the ex-husband Michael Wittmeyer had in his possession a 1997 Harley Davidson Sportster Motorcycle which was "titled," under New York Motor Vehicle Title Law, to Kimberly L. Wittmeyer only. He was the primary user of the motorcycle. He paid for the motorcycle (the source of funds is unknown to the Court), and it "was titled to his wife because he was unable to obtain a loan in his own name due to his poor credit." (The Court presumes that whatever loan Kimberly Wittmeyer took out to purchase the motorcycle was fully paid off by Michael Wittmeyer and is not a claim here against her Chapter 7 bankruptcy estate.)

The matrimonial agreement and decree were silent as to any Harley Davidson motor vehicle and did not make any provision for distribution of *any* property, but "merely stated that all personal property had been divided to the parties' mutual satisfaction."

Kimberly Wittmeyer's Chapter 7 Petition was filed on November 18, 2002, and on or about December 20, 2002, Michael

Wittmeyer sold the motorcycle over an internet auction service to a purchaser in Tacoma, Washington for the sum of $5,000. The question is whether the Trustee is entitled to the $5,000 simply because title was in the Debtor.

Initially, the Court notes that the fact that the motorcycle was sold post-petition probably makes that sale avoidable under 11 U.S.C. § 362 and 11 U.S.C. § 549.[1] However, the Trustee does not wish to avoid the sale, he wishes to obtain the proceeds of the sale. Consequently, the Court will ignore the fact that the sale was post-petition for purposes of this decision.

This type of fact pattern is presented in many different contexts. For example, in the Bench Ruling by this writer in the case of *Allen Clark,* Bankruptcy No. 97–10930 K, something akin to the "reverse" of this fact pattern was addressed. There, a motor vehicle was titled to a man's daughters. He asserted that he bought the vehicle for their use on the understanding that it would eventually be sold and he would get the proceeds. His children held clear record ownership on the title certificate. The car was stolen and then was later recovered by the Buffalo police and towed to an impound lot. Because the daughters were record owners, the City of Buffalo notified them that if they did not come to pick up the car from the impound lot and pay off the impound charges by a specified date, the City would auction off the motor vehicle. Instead of redeeming the car from the impound lot, the dad—again he was not the record owner of the motor vehicle—filed a Chapter 13 petition through his Pre-paid Legal Services Plan, and his Pre-paid Legal Services lawyer called the City Attorney to tell the attorney that the Debtor was claiming ownership of the ve-

---

1. Certainly title was not effectively conveyed. But possession perhaps could be. A "great price" on a Harley might be fully understood to necessitate settling with adverse claimants. Among afficionados possession might well be "nine points of the law."

hicle, that the Chapter 13 Petition had been filed, and that it would violate the automatic stay for the City to auction off the vehicle. The City auctioned off the vehicle anyway, selling the vehicle that had a book value of approximately $1600 for a $130 bid. The matter was brought before this Court on a motion to hold the City in violation of 11 U.S.C. § 362, and seeking damages. In ruling that the City had not violated the automatic stay when it relied on the record ownership status and ignored the attorney's verbal assertion that his client had an equitable or beneficial interest in the vehicle, this Court said

"innocent third parties relying on official records of the State, and who otherwise have no duty to inquire beyond the record status, are not subject to the kind of 'ownership by declaration' that the Debtor seeks to make operative here.... There is no agreement or other instrument memorializing the Debtor's claim to the vehicle, ... The sum total of the Debtor's claim against the City as of the time that that claim was first asserted was that these were the facts

as I have just related, as related by the Debtor to the Debtor's counsel, and that counsel had reason not to believe his client, and the present argument is that counsel's assertions thereof to the City should suffice to invoke the § 362 stay. Were that such under law, it would be bad policy. Whole new vistas of abuse, harassment, and delay would be opened. It would not longer be necessary even to execute conveyance documents to acquire standing to lead someone a merry and improper chase.... [The] argument that one has an equitable or beneficial interest simply by declaring it to be so, but having done nothing of record, would mean that you wouldn't even have to bother with a conveyance.... File a bankruptcy, no conveyance, nothing exe-

cuted, and saying 'well, we, had an agreement that it belonged to me and that I would have equitable beneficial interest in it.' This would open a whole new vista of abuse, harassment and delay. As a matter of statutory interpretation, the Debtor's argument would necessitate a finding that property of the Debtor, for purpose of the statute, presumptively includes property that the Debtor's attorney says that his or her client says the Debtor has some sort of interest in that could ultimately be found in a court to be a legally cognizable interest. That is simply too ephemeral, simply too vague, and no such rule can be made. As between the Debtor and one who is not in privity with the Debtor, such a result cannot prevail, rather the rule is that not every claim that relates to a property is a claim against the property itself such that acts directed at the property become acts against the property of the Debtor.... Had there in fact been written agreement between the Debtor and his children, it might have been a mere right to proceeds of sale. To accept the Debtor's argument here would be to credit the Debtor with an equitable lien or constructive trust that would constitute a higher form of assurance than that Debtor would actually have had, had they *not* decided *not* to document the transaction."

[Transcript of proceedings of November 21, 1997]

(The Court emphasized in that case that the result might be different had there been a pre-existing relationship, particularly a debtor-creditor relationship, pursuant to which the City knew the facts surrounding the acquisition of the motor vehicle and the Debtor's claim of right thereto.)

For purposes of the case that is before the Court today, we would simply substitute in the above discussion the word "Trustee" for the phrase "innocent third parties." Of course, the question of whether the automatic stay has been invoked is different from the actual plenary determination of ownership that is presently before this Court. But the rule would appear to be no different: Where record title is in the Debtor, equitable or beneficial interest does not lay in her ex-husband simply because he says it does. He chose to put the motor vehicle in his wife's name. That is a decision that had legal consequences. He chose not to insist on a conveyance of the motorcycle to him in the divorce proceeding. That decision also has legal consequences. To the extent that he paid the debt that paid for the motorcycle, and made no provision for a perfected lien on the motorcycle title certificate and no provision for a conveyance of title in the divorce, the sum total of his actions was to make a "gift" to Kimberly Wittmeyer, and he should have no valid claim to the proceeds of the sale of the motorcycle, absent wrongdoing on the Debtor's part.[2]

Though the above suffices as a decision in this case, this writer wishes to advise the former husband as well as the Bar in general that the above is simply one part of a cohesive set of principles governing such cases, even where a public record is not involved.

Another unpublished decision, in the case of *Courtney & Morse, Inc.*, Case No. 97–14938 K, recites that Key Bank claimed to hold a perfected security interest in certain collateral, but could not produce the security agreement. It had been lost. The bank argued that there was sufficient other evidence to establish the grant of a security interest and argued that consequently it didn't have to produce that lost security agreement. The Chapter 7 Trustee argued that without the agreement, he could not determine, among other things, whether the collateral had been properly described. Key Bank argued that the secondary evidence that it had produced sufficed, cumulatively, to satisfy the requirement that the intention of the parties be "expressed in the composite documents," as such a rule was enunciated in the case of *In re Bollinger Corp.*, 614 F.2d 924 (3rd Cir.1980). What it presented to the Court was a certain guarantee; a document manifesting shareholders' consent to the granting of a security interest; a board of directors' resolution that the debtor grant the mortgage and security interest; an executed financing statement; the affidavit of an officer of the bank stating that the bank was not able to locate the security agreement; and the fact that the debtor had in the bankruptcy schedules and statements listed Key Bank as a secured creditor.

In ruling against the bank, this writer stated "no case cited by Key Bank stands for the proposition that a pertinent document that was known to have existed can be ignored. Rather, all documentation must be considered because incongruities among the documents as to such matters as a description of the collateral would defeat the claim of the creditor.... That a security agreement was or is in existence here, but cannot be produced by Key Bank, is dispositive. Even good faith and lack of fault does not permit Key Bank to profit from its failure to produce the document.... Rather, it may be inferred, adverse to Key Bank, that the security

---

**2.** See *In re Howard's Appliance Corp.*, 874 F.2d 88 (2nd Cir.1989), and its progeny, as to wrongdoing by a debtor.

agreement would be inconsistent with the UCC 1, instead of consistent with it." (The "best evidence" rule did not avail the bank because there was not a scintilla of proof that a security agreement was in fact executed or what it in fact said—no photocopy, no affidavit of witness with personal knowledge of what it said and how it was executed, etc.)

In other words, given the fact that the UCC case books are packed full of cases involving improper descriptions of collateral and other fatal defects in security agreements, one cannot fare better here by saying that they lost a document than they would fare had that document been produced and shown to have a fatal defect.

Another permutation not involving a public record was presented in the published decision of *In re Ondrey*, 227 B.R. 211 (Bankr.W.D.N.Y.1998). There the debtor was a United States citizen residing in the United States and his employer was a Canadian corporation. He had a Canadian pension plan and a "retirement equity plan." Eventually, he rolled the equity plan funds over into an "RRSP," which is the Canadian version of what is an IRA in the United States. Once he became a debtor here he claimed that the funds in the RRSP (valued at over $80,000 U.S.) were exempt under New York Law because New York Law exempts IRAs.

In ruling that the Court must not treat an RRSP as an IRA for exemption purposes, this writer stated that

"This Court has said on a number of occasions that a party will not be found to have successfully attained a status, as against creditors, which he or she, without compelling reason, did not even seek. This Court ought not give him the same status that he would have had if he (or his employer, or his depository institution) had done whatever was necessary to assure that his retirement funds were held in a plan that qualified for exemption under New York Debtor and Creditor Law § 282. Otherwise, the Court ... would ignore the plain text of the exemption statute, would impinge upon the statutory authority of the Internal Revenue Service, the Congress, the State of New York, et al. to make such decisions, and would demean the efforts that countless other employers, employees and financial institutions undertake every day to assure that their devices are 'exempt' under State or Federal Law."

(The *Ondrey* decision was affirmed on this point and reversed in part on other grounds.)

This writer observed in that decision that Mr. Ondry could have brought his funds into the United States and placed them in an IRA when he instead rolled them into an RRSP; however, he presumably would have lost value in them because of the exchange rate from Canadian dollars to U.S. dollars.

The teaching of that particular holding for today's purpose is that a debtor who chose not to bring himself within the protection of an exemption statute could not be heard to claim, as against his Trustee in bankruptcy, that "Well, close is good enough." Not when we know how expensive and difficult a process it can be (not to mention *unavailing* sometimes) to attempt to bring some form of investment device into compliance with ERISA and other statutes which exemption statutes incorporate by express reference.

There are many other illustrations, but for today's purposes this writer will offer only one more. In an unpublished decision in the case of *Lakeland Health Care Center, Inc. v. The State of Florida, Agency for Health Care Administration*, this Court was asked to interpret the Orders

by which it approved the transfer of a Florida nursing home. The interpretation was required because there was a dispute between the new operators and the State of Florida regarding whether the transaction that this Court approved constituted a "sale" of the health care facility to a party who is "unrelated" to the previous owner, which was a Chapter 11 Debtor. It was not a § 363 sale or a sale under a plan. Rather, certain refinancing, sale and/or lease transactions were authorized by the Court and entered into by the Chapter 11 Debtor, the new acquirer, and an unaffiliated entity, Omega Health Care Investors, as part of a stipulated § 362(d) lift of stay to foreclose. The State of Florida assessed the new operators of the nursing home for depreciation recapture because the State of Florida characterized the transactions that this Court approved as a "sale" from the Debtor to Omega and a simple "lease" from Omega to the new owners. The new operators contended that the transactions were not intended to be a "sale" to Omega, but rather a sale to a "related entity" (the Chapter 11 debtor's owner's son was instrumental in the new ownership), and that Omega was merely a financier of the transaction. A sale to a "related entity" does not trigger recapture under Florida Law. Also, the ongoing Medicaid reimbursement rates to the nursing home were to be affected if Omega were to be viewed as the owner of the facility, rather than a mere lender.

In the documents as between Omega and the new owners, it was stated that those documents constituted "a true lease" and that the new owners would take "no position to the contrary." The new owners argued that this Court should determine that the intendment of the transaction was a financing device and that neither the language of the documents nor the fact that recorded title to the land was in Ome-ga, should control. In rejecting the argument, this writer stated this:

Lakeland's case authorities for the proposition that it is not bound even by the express and unequivocal provision in the lease . . . are inapposite. Not one of the bankruptcy cases cited involves a dispute with someone who is not a party to the agreement under scrutiny. Consequently, not one of the cases stands for the proposition that innocent third parties (here the Agency and (consequently) the taxpayers) are bound by the supposed intentions of the contracting party who elected a form for their transaction that is arguably at odds with their intentions.

Even the tax cases cited by Lakeland do not support its position. They stand for the proposition that when one seeks to obtain tax benefits of a certain form of transaction the taxing entity may look to the substance of the transaction, rather than its form, in order to determine whether the benefit should be available in fact. Here, Lakeland seeks exactly the opposite. Instead of seeking some Medicaid reimbursement benefit from its choice of form, it wishes the form to be completely ignored in order that it may enjoy the benefits of supposed "intentions" that were expressly disclaimed as a matter of form. To be specific, Lakeland wants the benefits of ignoring the express provision that the lease is a "true lease." (The notion that every finely-honed contract provision is mere "form" that is not to be elevated over substance is abhorrent to this writer. Lawyers' skills are not to be ennobled when they seek to achieve misdirection and sleight of hand. Sometimes parties must accept their choice of form, so that they will not be permitted, at someone else's expense, to have their cake and eat it too.)

Borrowing the colorful imagery of one of the cited cases, this is not a situation where [the Chapter 11 Debtor, the new owners, and Omega] drew a picture of a horse and asked that the Agency treat their product as a horse. [They] instead asked that their picture of a horse be treated as an elephant, or at least as a horse of a different color. While the bankruptcy cases cited by Lakeland might permit the bankruptcy court to impose the intention to draw an elephant on Lakeland or its privies even if it is a picture of a horse, there is no authority cited to bind a non-participating third party to that image.

[Case authority omitted. Emphasis omitted.]

So we see that even when lawyers are involved, the result may bind parties to unintended consequences.

In sum, decisions to avail oneself of the protection of law, or not to do so, have consequences that are not to be avoided (once the rights of innocent third party creditors are invoked in the bankruptcy process) simply because the decision has become inconvenient for the parties or because their original intention is going to be defeated. Sometimes what is at issue is the availability of recording statutes. Other times it is the availability of administrative agency review of a transaction for purposes of bringing the transaction within the scope of a statute that is not necessarily a recording statute. And at other times, the simple step of signing an "agreement" might suffice.[3]

■ In the case here now, the Defendant made a choice to let his wife own the Harley because otherwise he would not have been able to get the loan to purchase it. He could have had the matter dealt with in the divorce proceeding before she ended up in bankruptcy, but did not do so. He could have availed himself of the recording statutes that would have permitted him to have a recorded lien on the motorcycle so that the intention that it be "his" motorcycle alone might have been better assured so long as he fully paid the senior lien of the enabling loan that (I presume) his wife took out. He could have done many things. What he did *in law* was to "gift" any interest that he could have had by availing himself of proper opportunities to do so, to the person who is now his ex-wife and who is now a Chapter 7 Debtor. Whatever their intentions were when while married, or when they were divorced and did not deal with the motorcycle, their undocumented intentions will not avail him now that the interests of her creditors are being represented by a bankruptcy trustee. Judgment shall enter for $5,000 in favor of the Trustee and against Michael Wittmeyer. The Parties shall bear their own costs.

SO ORDERED.

---

**3.** In one unpublished decision, one person held a collateral security mortgage (not enabling mortgage or purchase-money mortgage) on a debtor's home. When a lift-stay motion for leave to foreclose came on for hearing, that debtor produced a document executed at the same time as the mortgage instrument by which the mortgagee agreed that there would never be a foreclosure so long as that homeowner lived there. Ruling that it was clear that the record lienholder wanted protection against the rest of the world, but had waived foreclosure as against that debtor, this writer put that mortgage "outside the Chapter 13 plan," to be dealt with in State court if that debtor failed to work matters out with the lender by the end of the Plan. Thus, a simple handwritten agreement sufficed to overcome "cause" to lift stay under 11 U.S.C. § 362(d), though it did not resolve for all time whether there was a right to foreclose.